IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

No. 4:15-CR-29-FL-1
No. 4:15-CR-29-FL-2

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | MEMORANDUM AND |
| | ) | RECOMMENDATION |
| AUGUSTO ESPINDOLA-PINEDA, | ) | |
| HUBERTO ESPINDOLA-SOTO, | ) | |
| | ) | |
| Defendants. | ) | |

This matter comes before the court to address the motions by Defendant Huberto Espindola-Soto ("Defendant Soto") to suppress all evidence seized on November 12, 2014 from 3906 Harold Sutton Road, La Grange, North Carolina, all custodial statements made by Defendant Soto, and any fruits thereof [DE-47, -66]; the motion by Defendant Augusto Espindola-Pineda ("Defendant Pineda") to suppress all evidence seized from 3906 Harold Sutton Road [DE-79]; and the motion in limine by Defendant Pineda to exclude summaries of translations of telephone calls at trial [DE-80]. The Government filed responses in opposition to Defendants' motions [DE-55, -83], and the undersigned held an evidentiary hearing on October 5, 2015, to further develop the record. Hr'g Tr. [DE-88]. Accordingly, this matter is ripe for review. For the reasons stated below, the undersigned reserves ruling on Defendant Pineda's motion in limine, and it is recommended that Defendant Pineda's motion to suppress and Defendant Soto's motions to suppress all be denied.

## I. PROCEDURAL BACKGROUND

On April 14, 2015, a Grand Jury sitting in the Eastern District of North Carolina charged Defendants by Indictment with one count of conspiracy to distribute and possess with the intent to distribute five kilograms or more of cocaine and 500 grams or more of a mixture or substance

containing a detectable amount of methamphetamine, Schedule II controlled substances, in violation of 21 U.S.C. §§ 841(a)(1) & 846; one count of knowingly and intentionally possessing with the intent to distribute 500 grams or more of cocaine and 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine and aiding and abetting, in violation of 18 U.S.C. § 2 and 21 U.S.C § 841(b)(1)(A); and one count of knowingly and intentionally possessing a firearm in furtherance of a drug trafficking crime and aiding and abetting in violation of 18 U.S.C. § 2 and 18 U.S.C. § 924(c)(1)(A). [DE-1]. At the suppression hearing, Defendant Soto submitted two exhibits: a photograph of the La Grange police substation conference room with notations made by Detective Ochoa (Def. Soto's Ex. 1), and a sealed, unredacted copy of Defendant Soto's Mexican identification card (Def. Soto's Ex. 2). Defendant Pineda did not present any evidence at the suppression hearing.

The Government presented the testimony of six witnesses: (1) Deputy Kenneth Black ("Deputy Black") of the Lenoir County Sheriff's Office, who conducted the traffic stop of Defendant Soto on November 12, 2014; (2) Officer Shawn Howard ("Officer Howard"), a Task Force Officer ("TFO") with the Lenoir County Sheriff's Office and the Drug Enforcement Administration ("DEA"), who was involved with the DEA's surveillance of Defendants and obtained arrest warrants for Defendants based on drug conspiracy charges; (3) Officer Michael Dawson ("Officer Dawson"), a TFO with the Wayne County Sheriff's Office and the DEA, who was involved with the DEA's surveillance of Defendants and obtained consent from Defendant Soto to search the Harold Sutton Road residence; (4) Detective Carlos Ochoa ("Detective Ochoa") of the Greenville Police Department, who provided translation services for both Defendants on November 12, 2014; (5) Sergeant Jovanni Villagra ("Sergeant Villagra"), of the Lenoir County Sheriff's Office who assisted with the search of the Harold Sutton Road residence after advising Defendant Soto of

2

his *Miranda* rights; and (6) Officer Jason Corprew ("Officer Corpew"), a TFO with the Wilson Police Department and the DEA, who interviewed both Defendants on November 12, 2014.

The Government also submitted thirty-five (35) exhibits: a photocopy of the citation issued to Defendant Soto by Deputy Black (Gov't Ex. 1); a redacted photocopy of Defendant Soto's Mexican identification card (Gov't Ex. 2); a photograph of the exterior of the Lenoir County Sheriff's Office substation in La Grange, North Carolina (Gov't Ex. 4); a photograph of the La Grange substation conference room (Gov't Ex. 5); a photograph of the La Grange substation interior office, used for police interviews (Gov't Ex. 6); a photograph of Defendant Soto (Gov't Ex. 7); a photograph of Defendant Pineda (Gov't Ex. 8); a photocopy of an arrest warrant issued for Defendant Pineda, signed by Magistrate K.C. Jones (Gov't Ex. 12); a photocopy of an arrest warrant issued for Defendant Soto, signed by Magistrate K.C. Jones (Gov't Ex. 13); a photocopy of an arrest warrant for Defendant Pineda, signed by Magistrate Jeb S. Griffin (Gov't Ex. 17); a photocopy of an arrest warrant for Defendant Soto, signed by Magistrate Jeb S. Griffin (Gov't Ex. 18); a photocopy of an arrest warrant for Frederico Espindola-Pineda, signed by Magistrate Jeb S. Griffin (Gov't Ex. 19); a photocopy of a "Cellular Phone Consent to Search Form" signed by Defendant Soto (Gov't Ex. 16); photographs taken during surveillance of Defendant Soto, Defendant Pineda, and Frederico Espindola-Pineda (Gov't Exs. 20-25, 29-39); a photocopy of a consent to search form signed by Defendant Soto, listing the address to be searched as 2786 Harold Sutton Road (Gov't Ex. 9); a photocopy of a consent to search form signed by Frederico Espindola-Pineda, listing the address to be searched as 2786 Harold Sutton Road (Gov't Ex. 10); a photocopy of a *Miranda* waiver form in Spanish, signed by Defendant Pineda (Gov't Ex. 14); a photocopy of a *Miranda* waiver form in Spanish, signed by Defendant Soto (Gov't Ex. 15); and a copy of Frederico Espindola-Pineda's Mexican identification card (Gov't Ex. 3). All exhibits were admitted without

3

objection.

## II. STATEMENT OF THE FACTS

The following factual summary is taken from the testimony of all of the witnesses who testified at the suppression hearing and is offered to establish a timeline of the events that occurred on November 12, 2014.

On the evening of November 11, 2014, the DEA intercepted phone conversations between Defendant Soto and another source target, discussing a shipment of drugs that would be delivered to the 3906 Harold Sutton Road residence ("Harold Sutton Road residence") on November 12, 2014. Hr'g Tr. [DE-88] at 38. In the early morning hours of November 12, 2014, the DEA set up surveillance at the Harold Sutton Road residence. *Id.* The plan was to stop Defendant Soto or Defendant Pineda once either was seen approaching or leaving the residence. *Id.* Officer Howard arrived to perform surveillance at 6:45 or 7:00 a.m. and contacted the Lenoir County Sheriff's Office to arrange for a canine officer's help with performing a possible traffic stop, ultimately reaching Deputy Black. *Id.* at 37, 41. Officer Howard left the Harold Sutton Road residence to apply for arrest warrants from a magistrate in Kinston, North Carolina, charging Defendants Soto and Pineda with a drug conspiracy, and Officer Dawson took over the surveillance. *Id.* at 41-42, 116. While Officer Howard was en route to the magistrate's office, he learned from Officer Dawson that a burgundy GMC Envoy had left the Harold Sutton Road residence. *Id.* at 41-42. Officer Howard returned to follow the Envoy and saw it pass by with Defendant Soto driving and Frederico Espindola-Pineda ("Frederico") in the passenger's seat. *Id.* at 42-43, 47. Officer Howard contacted Deputy Black and asked him to stop the Envoy, informing Deputy Black that Defendant Soto did not have a driver's license. *Id.* at 43-44. Officer Howard knew that Defendant Soto did not have a driver's license from surveillance conducted on July 1, 2014, where Defendant Soto was seen

4

paying a ticket at the Lenoir County Courthouse for driving without a license. *Id.*

At 7:50 a.m., Deputy Black stopped the Envoy, after seeing it drive by and noticing that Defendant Soto was not wearing a seat belt. *Id.* at 21. Within two to three minutes after Deputy Black stopped the Envoy and while he was trying to run Defendant Soto's identification, Officers Howard and Dawson arrived on scene and confronted Defendant Soto and Frederico. *Id.* at 15, 49-50. Officers Howard and Dawson decided to relocate to the Lenoir County Sheriff's Office substation in La Grange, because they did not know Defendant Pineda's location and did not want him to drive by the scene of the traffic stop. *Id.* Officer Dawson, Deputy Black, Defendant Soto, and Frederico travelled to the substation, and Deputy Black arranged for the Envoy to be taken there as well. *Id.* at 50, 118. Officer Howard left the scene of the traffic stop by 8:15 a.m. at the latest and went to the Lenoir County Sheriff's Office to type up conspiracy warrants for Defendants Soto and Pineda. *Id.* at 51-53. These were the warrants that Officer Howard had set out to obtain earlier that morning, charging Defendants Soto and Pineda with conspiracy to traffic and possess more than 400 grams of methamphetamine (Gov't Exs. 12 and 13). Hr'g Tr. [DE-88] at 51-53. Officer Howard estimated that the warrants, which do not bear a time stamp, were signed by Magistrate K.C. Jones between 9:30 and 10:00 a.m. *Id.*

Officer Howard testified that the basis for these warrants was intercepted calls referencing shipments of methamphetamine being delivered to Defendants Soto and Pineda at the Harold Sutton Road residence. *Id.* at 74-95. Pursuant to Title III wiretaps, the DEA monitored the phones of suspected drug traffickers from May 2012 until February 2014, which led to surveillance of Defendants Soto and Pineda on January 8, 2014, March 29, 2014, and July 1, 2014. *Id.* Interviews of other suspects corroborated that Defendants Soto and Pineda were involved in trafficking drugs. *Id.* While describing these warrants as charging a historical drug conspiracy, Officer Howard

5

admitted that there was a problem with the date of offense indicated on the warrants, which was listed as November 12, 2014 until November 12, 2014. *Id.* at 102-06. Officer Howard first stated that the magistrate wrote the date on the warrants incorrectly but then admitted that he drafted the warrants himself and stated that both he and the magistrate had been mistaken about the date of offense. *Id.* Officer Howard claimed that he provided information about the correct date of offense to the magistrate but neither caught the mistake on the warrants. *Id.*

While waiting at the substation with Defendant Soto and Frederico for the translator to arrive, Deputy Black issued Defendant Soto a traffic citation for driving without a license. *Id.* at 16. Deputy Black did not issue Defendant Soto a ticket or a written warning for not wearing his seat belt. *Id.* Detective Ochoa arrived at approximately 9:00 a.m., and Officer Dawson estimated that they had been waiting at the substation for about an hour. *Id.* at 119-20. Defendant Soto signed a consent to search form for the Harold Sutton Road residence at 9:20 a.m. (Gov't Ex. 9), and Frederico signed a similar consent to search form at 9:30 a.m. (Gov't Ex. 10). Hr'g Tr. [DE-88] at 121. Both forms list an incorrect address: 2786 Harold Sutton Road instead of 3906 Harold Sutton Road. Gov't Exs. 9 and 10. Officer Dawson testified that he gave the wrong information to Detective Ochoa, Detective Ochoa filled out the consent to search forms, and Detective Ochoa translated those forms to Defendant Soto and Frederico, who then signed the forms. *Id.* at 129-30. Detective Ochoa testified, however, that Officer Dawson provided him with a synopsis of the investigation and what had occurred that morning, Detective Ochoa provided that synopsis to Defendant Soto and Frederico and first obtained verbal consent to search, Detective Ochoa filled out the forms as he was translating them, the address line was blank when he was translating the forms and he told Defendant Soto and Frederico their address would go on that line, and the actual address was filled in by Detective Ochoa before Defendant Soto and Frederico signed the forms.

6

*Id.* at 137-40. After the consent to search forms were signed, Defendant Soto gave verbal consent to search the Envoy. *Id.* at 121-22. Deputy Black searched the Envoy and did not find any contraband. *Id.* at 18. Defendant Soto stood outside the substation, watching as Deputy Black searched the Envoy, and did not withdraw his consent. *Id.* at 123. Detective Ochoa then went to Defendant Pineda's residence at 2786 Peanut Road in Snow Hill, North Carolina and was not present for the search at the Harold Sutton Road residence. *Id.* at 142-45, 154.

Sergeant Villagra and Officer Corprew both arrived at the Harold Sutton Road residence to assist with the search before Officer Dawson brought Defendant Soto and Frederico to the residence. *Id.* at 166, 171. Officer Howard testified, after refreshing his recollection with a written report of the November 12, 2014 events, that Defendant Soto and Frederico arrived at the Harold Sutton Road residence at approximately 9:45 a.m. *Id.* at 113. After obtaining the arrest warrants from the magistrate, Officer Howard arrived at the Harold Sutton Road residence between 10:00 and 10:30 a.m. *Id.* at 107. According to Sergeant Villagra, between 10:00 and 11:00 a.m., in the presence of Officer Corprew, he advised Defendant Soto of his *Miranda* rights. *Id.* at 167-68. Defendant Soto invoked his rights and asked for a lawyer. *Id.* Officer Corprew testified that Sergeant Villagra advised Defendant Soto of his *Miranda* rights at approximately 10:45 a.m., immediately before the search began. *Id.* at 172-73. That time was recorded in the interview notes prepared later that day. *Id.*

Before Officer Howard arrived, the officers searching the Harold Sutton Road residence discovered a duffle bag containing crystal methamphetamine, three AR-15 assault rifles, and other paraphernalia. *Id.* at 57-59. Once he arrived, Officer Howard performed a follow-up search and discovered cocaine and more crystal methamphetamine in a false bottom under a kitchen cabinet. *Id.* After searching the house and the curtilage and after Defendant Soto had asserted his *Miranda*

7

rights, Officer Howard had Sergeant Villagra ask Defendant Soto for consent to search a Nissan Altima parked on the lawn. *Id.* at 169. Defendant Soto gave verbal consent to search the Altima. *Id.* When Officer Howard discovered the vehicle was locked, Sergeant Villagra asked Defendant Soto for the location of the keys. *Id.* Defendant Soto gestured towards the front door of the mobile home, where Officer Dawson was standing, and Officer Dawson found the keys inside of a light fixture. *Id.* at 56. Neither Defendant Soto nor Frederico withdrew their consent during the search, or gave any indication that they wanted the search to stop. *Id.* at 132. Defendant Soto was seated in Officer Dawson's car parked by the front door of the mobile home during the search, and Sergeant Villagra was standing at the open passenger door. *Id.* at 125, 133. According to Officer Howard, the search was completed between 12:00 and 1:00 p.m., Defendant Soto and Frederico were taken back to the substation, and Officer Howard stayed behind to arrange for the vehicles to be impounded. *Id.* at 59.

Detective Ochoa returned to the La Grange substation after the search of the Peanut Road residence to help Officer Corprew with interviews. *Id.* at 144. Defendant Pineda signed a *Miranda* waiver at 2:13 p.m. (Gov't Ex. 14) and was interviewed by Officer Corprew and Detective Ochoa in the small interview room at the substation. Hr'g Tr. [DE-88] at 174-75. After the interview concluded, Defendant Pineda was escorted back into the conference room and had a brief conversation in Spanish with Defendant Soto. *Id.* Defendant Soto then indicated to officers that he wanted to talk. *Id.* at 175. No one appeared to have overheard and understood the conversation between Defendants Pineda and Soto. *Id.* at 183. According to Detective Ochoa, Defendants Pineda and Soto were seated approximately five feet apart in the substation main conference room in one chair against the whiteboard and in one chair against the main table. *Id.* at 160-62; Def. Soto's Ex. 1. According to Officer Corprew, both Defendants were sitting in the row of chairs pushed back

8

against the whiteboard. Hr'g Tr. [DE-88] at 182. Defendant Soto signed a *Miranda* waiver at 3:30

p.m. and then was interviewed by Officer Corprew and Detective Ochoa. *Id.* at 176; Gov't Ex. 15.

When asked why he wanted to speak with police after initially invoking his *Miranda* rights,

Defendant Soto responded that he saw his cousin (Defendant Pineda) being arrested and Defendant

Pineda did not have anything to do with it. Hr'g Tr. [DE-88] at 176. Defendant Soto then made

inculpatory statements about selling cocaine and crystal methamphetamine, delivering drugs, and

about the firearms which had been found at the Harold Sutton Road residence. *Id.* at 177-79. After

the interviews were complete, Officer Howard took Defendant Soto, Defendant Pineda, and

Frederico to the Lenoir County jail and obtained additional warrants for all three men. *Id.* at 64-68;

Gov't Exs. 17-19. With Detective Ochoa's help, Officer Howard asked Defendant Soto for consent

to search two cell phones. Hr'g Tr. [DE-88] at 64-68. Defendant Soto signed the consent to search

form for the cell phones at 6:02 p.m. Gov't Ex. 16.

### III. DISCUSSION

### A.    Defendant Pineda's Motion in Limine [DE-80]

Defendant Pineda filed a motion in limine to exclude any and all summaries of translations

of telephone calls between Defendant and/or any other individuals, arguing that if the Government

plans to introduce written summaries of telephone calls instead of verbatim transcripts of the

recordings, *Crawford v. Washington*, 541 U.S. 36 (2004) and the Confrontation Clause of the United

States Constitution require that the Government produce the translator and any additional declarants

for cross-examination at trial. [DE-80]. At the hearing, counsel for Defendant Pineda and the

prosecution agreed that the parties were communicating about the phone conversations the

Government intended to introduce at trial with the intent to try and resolve those issues and asked

the court to reserve ruling on the motion in limine until closer to trial. Hr'g Tr. [DE-88] at 193-94.

9

Accordingly, the undersigned reserves ruling on Defendant Pineda's motion in limine [DE-80].

## B. Defendant Pineda's Motion to Suppress [DE-79]

Defendant Pineda filed a motion to suppress evidence seized as a result of the search of 3906 Harold Sutton Road. [DE-79]. Defendant Pineda argues that the Government failed to obtain valid consent to search the 3906 Harold Sutton Road residence and all evidence seized as a result of the unlawful search should be suppressed. [DE-79-1] at 4-5. In response to Defendant Pineda's motion [DE-83], the Government incorporates its response to Defendant Soto's motions to suppress [DE-55], wherein the Government argues, among other things, that there was knowing and voluntary consent to search the 3906 Harold Sutton Road residence. [DE-55] at 11-14.

Although not addressed by either party, the undersigned must first confront the question of whether Defendant Pineda had a legitimate expectation of privacy in the 3906 Harold Sutton Road residence. Fourth Amendment rights "are personal in nature and 'may not be vicariously asserted.'" *United States v. Rumley*, 588 F.3d 202, 206 n.2 (4th Cir. 2009) (quoting *Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978) (internal quotation marks omitted)). "In order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable[.]" *Minnesota v. Carter*, 525 U.S. 83, 88 (1998). This subjective expectation of privacy "must be objectively reasonable; in other words, it must be an expectation 'that society is prepared to recognize as reasonable.'" *United States v. Bullard*, 645 F.3d 237, 242-43 (4th Cir. 2011) (quoting *Bond v. United States*, 529 U.S. 334, 338 (2000) (internal quotations omitted)). "The burden of showing a legitimate expectation of privacy in the area searched rests with the defendant." *United States v. Castellanos*, 716 F.3d 828, 832 (4th Cir. 2013) (quoting *Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980)). "In some circumstances a person may have a legitimate expectation of privacy in the house of someone else." *Minnesota v.*

10

*Carter*, 525 U.S. 83, 89 (1998). For example, "an overnight guest in a home may claim the protection of the Fourth Amendment," but one who is "essentially present for a business transaction" may not. *Id.* at 90; *see also United States v. Gray*, 491 F.3d 138, 146-47 (4th Cir. 2007) (holding that a defendant who was present in another's apartment while engaging in drug trafficking activities lacked a legitimate expectation of privacy in the apartment and could not challenge the search), *cert. denied* 552 U.S. 1190 (2008).

Here, Defendant Pineda asserts the following as to his relationship with the 3906 Harold Sutton Road residence:

> [l]aw enforcement officers believed that [Defendant Soto] resided at 3906 Harold Sutton Road in La Grange, North Carolina. Law enforcement officers also alleged that [Defendant Pineda] frequented the residence at 3906 Harold Sutton Road, that he used the residence as a "stash house" for storing and distributing controlled substances and that he kept and maintained livestock on the property.

[DE-79-1] at 2. The evidence presented at the hearing demonstrated that Defendant Pineda resided at 2786 Peanut Road in Snow Hill, North Carolina. Hr'g Tr. [DE-88] at 49, 116, 143-44. No evidence was presented to show Defendant Pineda's connection to the 3906 Harold Sutton Road residence, aside from his involvement with shipments of contraband that were delivered to the residence. *See* Gov't Ex. 17 (arrest warrant charging Defendant Pineda with conspiring to keep and maintain a dwelling house at 3906 Harold Sutton Road in La Grange, North Carolina for purposes of keeping and selling cocaine and methamphetamine, but listing Defendant Pineda's address as 2786 Peanut Road in Snow Hill, North Carolina). Further, no evidence at the hearing was presented to show that Defendant Pineda maintained livestock at the 3906 Harold Sutton Road residence. Accordingly, on this evidence, the undersigned cannot conclude that Defendant Pineda has a legitimate expectation of privacy in the 3906 Harold Sutton Road residence sufficient to challenge the search of that residence. *See Gray*, 491 F.3d at 146-47; *accord United States v. Aldaya*, Nos.

11

5:12-CR-118-1-F, 5:12-CR-118-3-F, 2012 WL 5335293, at *4-5 (E.D.N.C. Oct. 26, 2012) (unpublished) (determining that defendant lacked a legitimate expectation of privacy to challenge the search of a house where the only evidence of his connection was that defendant was present and fled inside the house when police arrived and defendant claimed ownership of marijuana found inside but disclaimed ownership of all other items). It is thus recommended that Defendant Pineda's motion to suppress [DE-79] be denied.

## C.    Defendant Soto's Motions to Suppress [DE-47, -66]

Defendant Soto has moved to suppress all items seized from the residence located at 3906 Harold Sutton Road on November 12, 2014, all custodial statements made by Defendant Soto on that date, and any fruits thereof. [DE-47, -66]. Defendant Soto asserts that suppression is required by the Fourth, Fifth, and Sixth Amendments to the United States Constitution, *Miranda v. Arizona*, 384 U.S. 436 (1966) and *Rodriguez v. United States*, — U.S. —, 135 S. Ct. 1609 (2015). [DE-47, -66]. Specifically, Defendant Soto argues that the warrantless search of the Harold Sutton Road residence was conducted without valid consent; even assuming consent was given, that consent was the product of an illegal warrantless seizure; no exception to the warrant requirement existed to justify the search of the residence; Defendant Soto was impermissibly detained on the roadside after the purpose of the initial traffic stop should reasonably have been addressed; and Defendant Soto made custodial statements in response to questioning by law enforcement after asserting both his right to counsel and his right to remain silent. *Id.*

### i.    The Traffic Stop and Warrantless Arrest

Defendant Soto argues that at the time he signed the consent to search form, he was in custody following an illegal warrantless arrest and thus any purported consent would be invalid as a product of the illegal arrest. [DE-47] at 1, 4-5. Defendant Soto also argues that he was detained

12

on the roadside after the purpose of the initial traffic stop had been or reasonably should have been addressed, in violation of *Rodriguez*. [DE-66] at 1, 4.

The Fourth Amendment guarantees the right of the people to be secure against unreasonable searches and seizures. U.S. Const. amend. IV. A traffic stop constitutes a seizure within the meaning of the Fourth Amendment, and accordingly, in order to be reasonable a traffic stop must be supported by probable cause that a traffic violation has occurred, *Whren v. United States*, 517 U.S. 806, 809-10 (1996), or reasonable suspicion of criminal activity, *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). Similarly, a warrantless arrest is permissible only when there is probable cause to believe that the person being arrested is committing or has committed a felony based on the "totality of the circumstances." *Illinois v. Gates*, 462 U.S. 213, 230-31 (1983); *see United States v. McCraw*, 920 F.2d 224, 227 (4th Cir. 1990).

> Probable cause to arrest exists if the facts and circumstances within the arresting officers' knowledge at the moment the arrest is made would be sufficient for a prudent man to believe that the defendants had committed an offense. *United States v. Dorlouis*, 107 F.3d 248, 255 (4th Cir. 1997). "While probable cause requires more than bare suspicion, it requires less than that evidence necessary to convict." *United States v. Gray*, 137 F.3d 765, 769 (4th Cir. 1998) (internal quotation marks omitted). Even "seeming innocent activity" can provide the basis for probable cause when considered in the context of the surrounding circumstances. *Taylor v. Waters*, 81 F.3d 429, 434 (4th Cir. 1996).

*United States v. Joy*, 336 F. App'x 337, 340 (4th Cir. July 2, 2009) (unpublished) (per curiam).

The Fourth Circuit has held that "when an officer observes a traffic offense or other unlawful conduct, he or she is justified in stopping the vehicle under the Fourth Amendment" and this is true "regardless of the fact that the officer would not have made the stop but for some hunch or inarticulable suspicion of other criminal activity[.]" *United States v. Hassan El*, 5 F.3d 726, 730 (4th Cir. 1993) (citing *United States v. Cummins*, 920 F.2d 498, 500-01 (8th Cir. 1990) ("When an

13

officer observes a traffic offense—however minor—he has probable cause to stop the driver of the vehicle.")). The North Carolina statute at issue here, § 20-135.2A, provides that "each occupant of a motor vehicle manufactured with seat belts shall have a seatbelt properly fastened about his or her body at all times when the vehicle is in forward motion on a street or highway[.]" N.C. Gen. Stat. § 20-135.2A.

During a traffic stop, "[a]uthority for the seizure . . . ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Rodriguez*, 125 S. Ct. at 1614 (holding that police may not extend an otherwise-completed traffic stop to conduct a dog sniff without reasonable suspicion and noting that the critical question is whether the dog sniff adds time to the stop); *see United States v. Williams*, 808 F.3d 238 (4th Cir. 2015) (holding that there was no reasonable suspicion to extend an otherwise-completed traffic stop to conduct a dog sniff even though the sniff was completed within five minutes of the driver receiving a written warning). "Beyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to [the traffic] stop.'" *Rodriguez*, 125 S. Ct. at 1615 (quoting *Illinois v. Caballes*, 543 U.S. 405, 408 (2005)). "Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* (citing *Delaware v. Prouse*, 440 U.S. 648, 658-60 (1979)). "[T]o extend the detention of a motorist beyond the time necessary to accomplish a traffic stop's purpose, the authorities must either possess 'reasonable suspicion or receive the driver's consent.'" *Williams*, 808 F.3d at 245-46 (quoting *United States v. Digiovanni*, 650 F.3d 498, 507 (4th Cir. 2011); *United States v. Branch*, 537 F.3d 328, 336 (4th Cir. 2008)).

Here, Deputy Black testified that he stopped the Envoy after seeing that Defendant Soto was not wearing a seat belt. Hr'g Tr. [DE-88] at 11-12. Deputy Black observed the Envoy for less than

14

half of a mile before deciding to initiate the traffic stop. *Id.* at 30. Deputy Black was looking for a reason to stop the vehicle, and had been informed that Defendant Soto did not have a driver's license. *Id.* at 30-31. Deputy Black testified that he would have stopped the Envoy even had he not seen the seatbelt violation. *Id.* at 31. Once the Envoy was stopped, Deputy Black approached the vehicle and explained why he stopped Defendant Soto, then took the Mexican identification card Defendant Soto provided back to his patrol car to check for any outstanding warrants. *Id.* at 13-14, 34. When he was returning to his patrol car, Deputy Black had already decided that he would write Defendant Soto a citation for driving without a license but not for failing to wear his seat belt. *Id.* at 34. While Deputy Black was returning to his vehicle, Officers Dawson and Howard arrived at the scene. *Id.* at 15. Deputy Black testified that Officers Dawson and Howard arrived one to two minutes after he stopped the Envoy, and Officer Howard testified that they arrived two to three minutes after Deputy Black stopped the Envoy. *Id.* at 15, 49. Officers Dawson and Howard had a limited conversation with Defendant Soto and Frederico and then decided to detain them and take them to the La Grange substation.[1] *Id.* at 15-16, 48-49, 117-18.

Here, Deputy Black had probable cause to stop the Envoy after seeing Defendant Soto driving without wearing his seat belt, in violation of N.C. Gen. Stat. § 20-135.2A. Regardless of the fact that Deputy Black planned to stop the Envoy based on the information about Defendant Soto's lack of a driver's license and even though Deputy Black ultimately did not write Defendant Soto a citation for failing to wear his seat belt, the inquiry here is whether Deputy Black had either probable cause that a traffic violation had occurred or reasonable suspicion of criminal activity at the time of the traffic stop. *Whren*, 517 U.S. at 809-10; *Arvizu*, 534 U.S. at 273. Because Deputy Black

---

[1] There appears to be no dispute between the parties that at this time Defendant Soto was under arrest and taken into custody.

observed Defendant Soto's seat belt violation, he had probable cause to stop the Envoy "regardless of the fact that [he] would not have made the stop but for some hunch or inarticulable suspicion of other criminal activity[.]" *Hassan El*, 5 F. 3d at 730. Further, there was no impermissible extension of an already-completed traffic stop that would violate the Fourth Amendment. *See Rodriguez*, 125 S. Ct. at 1614; *Williams*, 808 F.3d at 238. Defendant Soto appears to argue that Deputy Black had already completed the traffic stop and there was an impermissible delay while he waited for Officers Dawson and Howard to arrive on scene. [DE-66] at 1, 4. However, the testimony of Deputy Black and Officer Howard establishes that Officers Dawson and Howard arrived at the scene of the traffic stop within one to three minutes after Deputy Black stopped the Envoy, while Deputy Black was returning to his vehicle to run Defendant Soto's identification and check for outstanding warrants. Hr'g Tr. [DE-88] at 15, 34, 49. "[T]asks tied to the traffic infraction" include "ordinary inquiries incident to [the traffic] stop[,]" such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Rodriguez*, 125 S. Ct. at 1614-15 (internal quotations and citations omitted). Thus, where Deputy Black was still in the process of completing "ordinary inquiries incident to [the traffic] stop" as he was returning to his vehicle to run Defendant Soto's driver's license, the traffic stop was not already completed and *Rodriguez* is not implicated. Additionally, where one to three minutes had passed between the traffic stop and Deputy Black returning to his vehicle to check Defendant Soto's identification, the undersigned is not persuaded that the tasks tied to the traffic stop should reasonably have been completed prior to that point. *See Rodriguez*, 125 S. Ct. at 1614.

Further, after Officers Dawson and Howard had a limited conversation with Defendant Soto and Frederico, the officers decided to detain them and take them to the La Grange substation. Hr'g Tr. [DE-88] at 15-16, 48-49, 117-18. Defendant Soto argues that he was subjected to an illegal

16

warrantless arrest, because while officers were investigating him in connection with drug offenses, "they lacked probable cause to believe that he possessed drugs *at the time* Detective Howard ordered that defendant be stopped and arrested." [DE-47] at 4. The Government responds that officers performed a lawful warrantless arrest pursuant to N.C. Gen. Stat. § 15A-401(b)(2) because Officer Howard had probable cause to believe that Defendant Soto had committed felony conspiracy to traffic methamphetamine and Defendant Soto did not have a valid driver's license, and consequently Officer Howard was not required to believe that Defendant Soto possessed drugs in order to make a lawful warrantless arrest. [DE-55] at 10-11. The undersigned determines that Officer Howard had probable cause to believe that Defendant Soto was involved in a drug conspiracy, and thus does not reach the Government's argument as to the driver's license.

In North Carolina, an officer may perform a warrantless arrest when the officer has probable cause to believe that a person has committed a felony outside of the officer's presence. N.C. Gen. Stat. § 15A-401(b)(2). Here, Officer Howard detailed the months-long investigation and surveillance into Defendants Pineda and Soto, including intercepted calls referencing shipments of methamphetamine being delivered to Defendants Soto and Pineda at the Harold Sutton Road residence, surveillance of Defendants Soto and Pineda, and interviews of other suspects corroborating the involvement of Defendants Soto and Pineda with drug trafficking. Hr'g Tr. [DE-88] at 74-95. Accordingly, the undersigned determines that Officer Howard had probable cause to believe Defendant Soto was involved in a felony conspiracy to traffic methamphetamine, and the warrantless arrest of Defendant Soto from the scene of the traffic stop was permissible under the Fourth Amendment. Defendant Soto's argument that any purported consent obtained after the warrantless arrest must be excluded based on *Florida v. Royer*, 460 U.S. 491 (1983), is thus without merit.

17

## ii. Compliance with N.C. Gen. Stat. § 15A-401

Defendant Soto alleges that despite being under arrest when he arrived at the La Grange

substation, he was not taken before a magistrate for purposes of an initial appearance, advised of the

charges against him nor provided with written documentation of the charges, and was not advised

of his *Miranda* rights nor provided the opportunity to speak with an attorney in violation of N.C.

Gen. Stat. § 15A-501. [DE-47] at 2. The Government responds that Defendant Soto's rights under

N.C. Gen. Stat. § 15A-501 were not violated. [DE-55] at 14-15.

N.C. Gen. Stat. § 15A-501 provides that

[u]pon arrest of a person, with or without a warrant, but not necessarily in the order
hereinafter listed, a law-enforcement officer:

(1) Must inform the person arrested of the charge against him or the cause for his
arrest.

(2) Must, with respect to any person arrested without a warrant and, for purpose of
setting bail, with respect to any person arrested upon a warrant or order for arrest,
take the person arrested before a judicial officer without unnecessary delay.

. . . .

(5) Must without unnecessary delay advise the person arrested of his right to
communicate with counsel and friends and must allow him reasonable time and
reasonable opportunity to do so.

Similarly, at the initial appearance before the magistrate, "[t]he magistrate must inform the

defendant of: (1) [t]he charges against him; (2) [h]is right to communicate with counsel and friends;

and (3) [t]he general circumstances under which he may secure release under the provisions of

Article 26, Bail." N.C. Gen. Stat. § 15A-511(b). In discussing these statutes, North Carolina courts

have held that "these statutes do not prescribe mandatory procedures affecting the validity of a trial."

*State v. Reynolds*, 298 N.C. 380, 398-99, 259 S.E.2d 843, 854 (1979) (holding that there was no

unnecessary delay where there was a two to three-hour delay in taking the defendant before a

18

magistrate so officers could interrogate him and obtain hair and blood samples); *accord State v. Wallace*, 351 N.C. 481, 516-18, 528 S.E.2d 326, 349-50 (2000) (no unnecessary delay where defendant was taken before a magistrate 19 hours after his arrest, where defendant waived his *Miranda* rights and was interrogated, confessed to a number of crimes, and investigators allowed defendant to sleep for approximately four hours); *State v. Chapman*, 343 N.C. 495, 500, 471 S.E.2d 354, 356 (1996) (no unnecessary delay where defendant was arrested at 9:30 a.m., a magistrate issued an arrest warrant at 12:30 p.m. and thus determined the existence of probable cause, and defendant was not taken before a magistrate until 8:00 p.m.); *State v. Littlejohn*, 340 N.C. 750, 758, 459 S.E.2d 629, 633-34 (1995) (no unnecessary delay where defendant was not taken before a magistrate for 13 hours after his arrest, and in between waived his *Miranda* rights and was interrogated). "A magistrate has the duty to inform a defendant of this statutory right" to communicate with counsel and friends. *State v. Lewis*, 147 N.C. App. 274, 277, 555 S.E.2d 348, 351 (2001) (citing *State v. Knoll*, 322 N.C. 535, 369 S.E.2d 558 (1988); N.C. Gen. Stat. § 15A-511(b)).

Here, Defendant Soto was stopped at 7:50 a.m. on November 12, 2014 and taken into custody pursuant to a warrantless arrest, and was not taken before a magistrate until approximately 6:00 p.m. Hr'g Tr. [DE-88] at 21, 68-69. Defendant Soto signed a consent to search form for the Harold Sutton Road residence at 9:20 a.m., was advised of his *Miranda* rights at approximately 10:45 a.m., was present for the search of the Harold Sutton Road residence in case he wanted to withdraw that consent, waived his *Miranda* rights at 3:30 p.m., and then gave a statement to police before being taken before a magistrate. *Id.* at 121, 125, 152, 173. Approximately ten hours passed between the time Defendant Soto was taken into custody and when he was taken before a magistrate. North Carolina courts have previously held that similar delays in taking a defendant before a

19

magistrate were not in violation of N.C. Gen. Stat. § 15A-501, particularly where the defendant waived his *Miranda* rights and was interrogated prior to being taken before a magistrate. *See, e.g.*, *Littlejohn*, 340 N.C. at 758, 459 S.E.2d at 633-34 (no unnecessary delay where defendant was not taken before a magistrate for 13 hours after his arrest, and in between waived his *Miranda* rights and was interrogated).

Additionally, similar to the *Chapman* case, Magistrate K.C. Jones signed arrest warrants for Defendants Soto and Pineda charging felony conspiracy to traffic and possess methamphetamine somewhere between 9:30 and 10:00 a.m., after Defendant Soto was taken into custody. Gov't Exs. 12 and 13; Hr'g Tr. [DE-88] at 51-53; *see Chapman*, 343 N.C. at 500, 471 S.E.2d at 356 (no unnecessary delay where defendant was arrested at 9:30 a.m., a magistrate issued an arrest warrant at 12:30 p.m. and thus determined the existence of probable cause, and defendant was not taken before a magistrate until 8:00 p.m.). Defendant Soto challenges the arrest warrants signed by Magistrate K.C. Jones, arguing that Magistrate Jones did not find probable cause to support the prior felony offenses that were used to support the warrantless arrest because the offense date on the warrants is listed as November 12, 2014 through November 12, 2014. Hr'g Tr. [DE-88] at 195. Officer Howard, however, testified that he mistakenly listed that date on the warrant and both he and the magistrate failed to recognize the mistake. *Id.* at 104-05.

The Federal Rules of Criminal Procedure provide that a warrant must contain the defendant's name or a description of the defendant and describe the offense charged in the complaint. Fed. R. Crim. P. 4(b)(1). The Third Circuit has held that an arrest warrant which listed an erroneous date of offense was not invalid. *United States v. Carter*, 756 F.3d 310, 313 (3rd Cir. 1985) (criminal complaint and arrest warrant listed the date of offense as September 14, 1983 instead of September 7, 1983), *cert. denied*, 478 U.S. 1009 (1986). The Third Circuit held that

20

[a] mere technical error does not automatically invalidate the warrant. The true inquiry . . . is . . . whether there has been such a variance as to affect the substantial rights of the accused. A mere inaccuracy in setting forth the date of an offense in a criminal complaint would not appear to be a material or critical variance. The incorrect date here did not negate any elements of the charged offense. Thus, it did not affect the validity of the charge. Furthermore, the defendant never proved that the misstatement was made intentionally or with reckless disregard for the truth. Such a showing would appear to be required.

*Id.* (internal quotations and citations omitted); *see also McLean v. Mallott*, 10 F.3d 806, 1993 WL 455239, at \*1 (4th Cir. Nov. 5, 1993) (unpublished) (per curiam) (citing to *Carter* and noting that "the typographical error in the date on [McLean's] arrest warrant did not render the warrant invalid."). Accordingly, here, the warrant is not invalid due to the error in the date of offense, and the warrant's issuance after Defendant Soto was taken into custody but before he was brought before a magistrate further supports a determination that there was no unnecessary delay in violation of N.C. Gen. Stat. § 15A-501. *See Chapman*, 343 N.C. at 500, 471 S.E.2d at 356. However, even disregarding the warrant issued between 9:30 and 10:00 a.m., the delay of approximately ten hours between Defendant Soto being taken into custody and being brought before a magistrate does not constitute unnecessary delay under N.C. Gen. Stat. § 15A-501. *See Littlejohn*, 340 N.C. at 758, 459 S.E.2d at 633-34 (holding that a period of 13 hours between arrest and presentment to magistrate did not constitute unnecessary delay).

### ii.    Consent to Search

Defendant Soto argues that the warrantless search of the Harold Sutton Road residence violated his Fourth Amendment rights. [DE-47] at 1, 3-4. Specifically, Defendant Soto argues that there was no valid consent to search because the written consent form authorizes the search of a different location, any consent was the product of an unlawful warrantless arrest, and no other exceptions to the warrant requirement would have allowed for the search. *Id.* The Government

21

responds that the search of the Harold Sutton Road residence was conducted pursuant to Defendant Soto's knowing and voluntary verbal consent. [DE-55] at 11-14.

Under the Fourth Amendment, a search conducted without a warrant issued upon a showing of probable cause is "per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967) (footnotes omitted). A search conducted pursuant to valid consent is one such exception to the Fourth Amendment's general warrant requirement. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973); *Trulock v. Freeh*, 275 F.3d 391, 401 (4th Cir. 2001) (citation omitted). In order to be valid, consent to search must be knowing and voluntary, and the determination of whether consent was voluntary is based on the totality of the circumstances. *United States v. Buckner*, 473 F.3d 551, 554 (4th Cir. 2007) (citations omitted); *United States v. Boone*, 245 F.3d 352, 361 (4th Cir. 2001) (citations omitted). The Government has the burden of establishing valid consent to search, which it must show by a preponderance of the evidence. *Buckner*, 473 F.3d at 554.

> Factors that are appropriate for the district court to consider include the characteristics of the accused (such as age, maturity, education, intelligence, and experience) and the conditions under which the consent to search was given (such as the officer's conduct, the number of officers present, and the duration of the encounter). Whether the accused knew he possessed a right to refuse consent is a relevant factor, but the government need not demonstrate that the defendant knew of his right to refuse consent to prove that consent was voluntary. Consent given while in custody may still be voluntary.

*Boone*, 245 F.3d at 361-62 (citations omitted); *see also United States v. Lattimore*, 87 F.3d 647, 651 (4th Cir. 1996) (en banc) (holding that the defendant gave verbal consent to search even though he hesitated prior to signing a written consent form and noting that "a refusal to execute a written consent form subsequent to a voluntary oral consent does not act as an effective withdrawal of the prior oral consent.").

22

"Consent may be inferred from actions as well as words." *United States v. Hylton*, 349 F.3d 781, 786-87 (4th Cir. 2003) (collecting cases) (holding that implied consent to enter an apartment and retrieve a gun existed where "a tenant calls police for assistance, stating that she is barred from her apartment, expressing fear about the presence of a gun, and describing precisely where the gun is located, it can be inferred that she is authorizing the police to enter the apartment and retrieve the gun."); *accord United States v. Wilson*, 895 F.2d 168, 172 (4th Cir. 1990) (per curiam) (holding that the defendant consented to a pat-down search when he responded to an officer's request to search by "shrugging his shoulders and raising his arms"). *But see Bumper v. North Carolina*, 391 U.S. 543, 548-49 (1968) (holding that the burden of proving voluntary consent "cannot be discharged by showing no more than acquiescence to a claim of lawful authority" where police officers falsely represented to a homeowner that they had a search warrant for the home and then asked for consent to search).

Voluntary consent is "the product of an essentially free and unconstrained choice by its maker[,]" whereas involuntary consent occurs when "a defendant's will was overborne in a particular case[.]" *Schneckloth*, 412 U.S. at 225-26 (internal quotation omitted); *see United States v. Elie*, 111 F.3d 1135, 1145-46 (4th Cir. 1997) (holding consent was voluntary even though at least six officers were present when the defendant granted consent to search and noting that the absence of *Miranda* warnings is another factor to be considered in assessing voluntariness and "[n]either the drawing of a gun by an arresting officer, nor the handcuffing of the accused establishes involuntariness in and of itself."), *abrogated in part on other grounds by Dickerson v. United States*, 530 U.S. 428 (2000); *United States v. Alvarez-Herrera*, No. 5:13-CR-61-FL, 2013 WL 6531175, at *23 (E.D.N.C. Dec. 12, 2013) (unpublished) (holding consent was voluntary where the defendant was asked for and gave consent in his native language in the presence of only two officers, the

23

officers made no false or misleading statements suggesting that the defendant could not refuse consent, and the defendant had been cooperative in complying with the officer's requests throughout the encounter); *United States v. Hernandez-Sanchez*, No. 5:11-CR-65-FL, 2011 WL 3420605, at \*9 (E.D.N.C. July 8, 2011) (unpublished) (holding consent was voluntary where "there [were] no known characteristics of the defendant, such as age, maturity, education, intelligence, and experience, that suggest consent was involuntary" and officers did not use threatening language or raised voices, despite the fact that the defendant "was subject to a pat-down search, there were up to seven officers present[,] the encounter took more than a few minutes and . . . officers had blocked in [the defendant's] vehicle with at least three of their own vehicles."), *adopted by* 2011 WL 3420598 (E.D.N.C. Aug. 4, 2011). *But see United States v. Watson*, No. 5:14-CR-95-BO, 2014 WL 5100610, at \*1-2 (E.D.N.C. Oct. 10, 2014) (unpublished) (determining that consent to search a home was not voluntary where police had already performed a "protective sweep" of the residence, the defendant was handcuffed, had not been read his *Miranda* rights, and told that the police had "probable cause to get a warrant to search, or you can just consent to the search now").

Having considered the relevant factors, the undersigned determines that Defendant Soto gave voluntary and knowing verbal consent to search the residence at 3906 Harold Sutton Road in La Grange, North Carolina.[2] Officer Dawson testified that he gave a synopsis of the morning's events to Detective Ochoa, and then Detective Ochoa translated and received consent to search the Harold Sutton Road residence from Defendant Soto. Hr'g Tr. [DE-88] at 124-25. Officer Dawson provided Detective Ochoa with the wrong address to fill in on the consent form, since Officer Dawson had

---

[2] While both Defendant Soto and Frederico provided consent to search the Harold Sutton Road residence, the briefing and hearing testimony focus on the validity of the consent provided by Defendant Soto. Further, Detective Ochoa testified that he used the same procedure to obtain consent from both Defendant Soto and Frederico, Hr's Tr. [DE-88] at 137-41, so the analysis of whether Frederico gave valid consent to search would be largely similar. Accordingly, the undersigned focuses on the validity of Defendant Soto's consent to search the residence.

24

more frequently performed surveillance at the 2786 Peanut Road address during the investigation. *Id.* Officer Dawson testified that "[a]fter I spoke with Detective Ochoa, he stepped back in there and began speaking with them just to kind of, I guess, give them a brief synopsis of what was going on and then asked for consent to search the residence." *Id.* at 125. On cross-examination, Officer Dawson agreed that Detective Ochoa filled out the consent form, translated the consent form from English to Spanish to Defendant Soto, and then Defendant Soto signed the consent form. *Id.* at 129-30. Detective Ochoa, however, testified that he first asked for verbal consent to search the residence, which Defendant Soto provided, and then Detective Ochoa translated the consent form while he was filling it out. *Id.* at 138-39. However, when he reached the line for the place to be searched, Detective Ochoa told Defendant Soto "this is where your residence goes" and Officer Dawson then gave him the 2786 Harold Sutton Road address. *Id.* at 139. Detective Ochoa did not read that address to Defendant Soto, but it was filled in on the form before Defendant Soto signed the form. *Id.* Further, in response to a question about how he asked Defendant Soto for consent to search the Harold Sutton Road residence, Detective Ochoa stated:

A.     I had recently gave them the synopsis of what Detective Dawson had said that they had conducted surveillance that morning. He gave me descriptions of—descriptors of—physical descriptors of the residence and the goats and the vehicles and how they were observed leaving the Harold Sutton address. When I asked for consent, besides trying to read this verbatim, I also—

Q.     What document do you mean?

A.     When I was asking for consent I, of course, besides trying to read this verbatim, I also gave them a synopsis of what was going on and asked them to search their residence, and those are my words, their residence, at Harold Sutton Road.

Q.     And when you asked to search their residence on Harold Sutton Road, what did [Defendant Soto] tell you?

A.     That he—he consented to search his residence. First verbally and then we did a verbatim and in writing. And as we went along, that's basically—we asked the question twice.

Q.     Okay, so when you did it verbatim, you mean you did it verbatim per the form?

25

A.      The first time it was verbatim, a synopsis of we're going to ask for consent
        to search your residence, I'm going to need you to sign a form, and then I
        went ahead and read the form as I was filling it out.

*Id.* at 138-39.

   "[I]t is the role of the district court to observe witnesses and weigh their credibility during

a pre-trial motion to suppress." *United States v. Abu Ali*, 528 F.3d 210, 232 (4th Cir. 2008) (quoting

*United States v. Murray*, 65 F.3d 1161, 1169 (4th Cir. 1995)). The undersigned determines, after

hearing Detective Ochoa's testimony and observing his demeanor on the stand during direct and

cross-examination, that Detective Ochoa is credible in his recollection of first obtaining verbal

consent to search the Harold Sutton Road residence from Defendant Soto prior to Defendant Soto

signing the consent form. Defendant Soto correctly highlights that the testimony of Officer Dawson

and Detective Ochoa differs as to how Detective Ochoa filled out the consent to search form and

translated that form to Defendant Soto, particularly as to whether the address was filled in while

Detective Ochoa was translating the form. Despite this troubling discrepancy, the testimony of both

officers supports that Detective Ochoa first asked for verbal consent to search prior to translating

the consent form to Defendant Soto. *Compare* Hr'g Tr. [DE-88] at 125 (Officer Dawson: "[a]fter

I spoke with Detective Ochoa, he stepped back in there and began speaking with them just to kind

of, I guess, give them a brief synopsis of what was going on and then asked for consent to search

the residence."), *with id.* at 138 (Detective Ochoa: "I also gave them a synopsis of what was going

on and asked them to search their residence, and those are my words, their residence, at Harold

Sutton Road."). Further, given that Officer Dawson does not speak Spanish and did not directly ask

Defendant Soto for verbal consent himself, it is not surprising that Detective Ochoa's memory on

this point is clearer. Accordingly, having determined that Defendant Soto gave oral consent to

search the Harold Sutton Road residence, the undersigned must consider whether that oral consent

was knowing and voluntary.

Weighing against a finding of voluntary consent in this case is the fact that Defendant Soto was in custody following a warrantless arrest, was in handcuffs, and had not been provided with *Miranda* warnings before giving consent to search the Harold Sutton Road residence. However, the following factors weigh in favor of a finding of voluntary consent: Defendant Soto signed a written consent form following his verbal consent, Defendant Soto was speaking with a translator in his native language, Defendant Soto gave consent in the presence of only two law enforcement officers, no threats or promises were made to induce Defendant Soto into giving consent and Defendant Soto did not hesitate in granting consent, Defendant Soto had previous experience with law enforcement and the court system, Defendant Soto gave consent to search the Envoy and did not withdraw that consent while watching the search take place, and Defendant Soto was present and did not withdraw his consent while watching officers search the residence at 3906 Harold Sutton Road. *See Boone*, 245 F.3d at 361-62 (listing the factors to be considered in determining whether consent was voluntary). Counsel for Defendant Soto took issue at the hearing with the fact that Detective Ochoa was not a certified interpreter. However, Defendant Soto has not provided any persuasive reason to doubt the accuracy of Detective Ochoa's translation, particularly where Detective Ochoa testified that he had translated in similar circumstances many times in the past and he was bilingual in Spanish and English. *See Alvarez-Herrera*, 2013 WL 6531175, at *2-3 (adopting a memorandum and recommendation and overruling an objection to a finding that translation was sufficient where "Defendant has not provided any persuasive reason to doubt the accuracy of Perez's translation. The mere fact that Perez was performing his first interview on patrol does not render his translation insufficient or inaccurate.").

Further, to the extent that Defendant Soto is arguing that the written consent with the wrong

27

address number invalidates verbal consent given prior to the written consent form being signed, this argument is without merit. *See Lattimore*, 87 F.3d at 651 (holding that the defendant gave verbal consent to search even though he hesitated prior to signing a written consent form and noting that "a refusal to execute a written consent form subsequent to a voluntary oral consent does not act as an effective withdrawal of the prior oral consent."); *Alvarez-Herrera*, 2013 WL 6531175, at *21 (holding that verbal consent to search was voluntary and was established by the combined testimony of two officers, even though one's testimony was less clear on the issue of verbal consent, and noting that the verbal consent was bolstered by a later written consent, even though the description of the place to be searched on the consent form was mistakenly left blank). Accordingly, having considered the totality of the circumstances, the undersigned determines that Defendant Soto gave valid verbal consent to search the residence at 3906 Harold Sutton Road in La Grange, North Carolina. Defendant Soto's argument that no exception to the warrant requirement existed to justify the search of the residence is thus without merit.

### iii. *Miranda* Rights

Defendant Soto argues that officers in this case purposefully allowed Defendant Pineda, who had waived his *Miranda* rights and given an interview to officers, access to Defendant Soto, who had asserted his *Miranda* rights earlier that day.[3] [DE-66] at 3. Defendant Soto argues that by allowing the co-defendants to speak, officers intended to encourage Defendant Soto to waive his *Miranda* rights, re-initiate contact, and provide an interview to law enforcement. *Id.* Defendant Soto contends that his subsequent re-initiation of contact, *Miranda* waiver, and statement given to

---

[3] Defendant Soto argues in his first motion to suppress that he made involuntary statements while in custody prior to receiving his *Miranda* rights. [DE-47] at 1, 3. However, the testimony and arguments at the hearing focused on whether officers properly honored Defendant Soto's assertion of his *Miranda* rights by allowing the two co-defendants access to one another. Further, no statements by Defendant Soto have been identified as being made between the time he was taken into custody and approximately 10:45 a.m. when he initially invoked his *Miranda* rights.

28

officers were involuntary and were induced by the improper actions of the officers. *Id.* In response, the Government argued at the hearing that Defendant Soto voluntarily initiated contact with officers, waived his *Miranda* rights, and gave a statement. Hr'g Tr. [DE-88] at 217.

The Fifth Amendment guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself[.]" U.S. Const. amend. V. To protect this right, the Supreme Court adopted in *Miranda v. Arizona*, 384 U.S. 436 (1966), several procedural rules governing custodial interrogations. *Id.* at 479. Prior to any questioning, a defendant must be warned "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him[.]." *Id.* Any statement elicited from a defendant in violation of these procedural rules is inadmissible in the prosecution's case-in-chief. *Oregon v. Elstad*, 470 U.S. 298, 307 (1985). Further, once an individual has invoked his *Miranda* right to counsel, he cannot be "subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981).

"The concern of the Court in *Miranda* was that the 'interrogation environment' created by the interplay of interrogation and custody would 'subjugate the individual to the will of his examiner' and thereby undermine the privilege against compulsory self-incrimination." *Rhode Island v. Innis*, 446 U.S. 291, 299 (1980) (quoting *Miranda*, 384 U.S. at 457-58); *see also Illinois v. Perkins*, 496 U.S. 292, 296-99 (1990) (holding *Miranda* warnings were not required before an undercover officer posing as an inmate asked questions of a cellmate, noting "[i]t is the premise of *Miranda* that the danger of coercion results from the interaction of custody and official interrogation."). Interrogation "refers not only to express questioning, but also to any words or

29

actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Innis*, 446 U.S. at 301 (footnotes omitted). Additionally, "since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." *Id.* at 301-02 (footnote omitted) (holding that the defendant was not interrogated or subjected to the "functional equivalent" of questioning where officers were discussing the likelihood of handicapped children finding a missing shotgun discarded by defendant while transporting defendant to the police station after he had invoked his *Miranda* rights); *see also Airzona v. Mauro*, 481 U.S. 520, 525-30 (1987) (holding that allowing a wife to speak with her husband who had asserted his *Miranda* right to counsel was not the functional equivalent of police interrogation even though there was a possibility that the husband would incriminate himself and officers were aware of that possibility, and observing that the husband "was not subjected to compelling influences, psychological ploys, or direct questioning."); *United States v. Kimbrough*, 477 F.3d 144, 150 (4th Cir. 2007) ("the issue in *Miranda* and its descendants is whether particular actions *by the police* . . . constitute interrogation . . . . [as] the Fifth Amendment is not 'concerned with moral and psychological pressures to confess emanating from sources other than official coercion.'") (quoting *Elstad*, 470 U.S. at 304-05).

After receiving *Miranda* warnings, a defendant "may knowingly and intelligently waive these rights and agree to answer questions or make a statement." *Miranda*, 384 U.S. at 479. Such a waiver "must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception" and "must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to

30

abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). The prosecution bears the burden of proving a valid waiver of *Miranda* rights by the preponderance of the evidence. *Missouri v. Seibert*, 542 U.S. 600, 608 n.1 (2004) (citing *Colorado v. Connelly*, 479 U.S. 157, 169 (1986)). "The determination of whether a waiver was knowing and intelligent requires an examination of the totality of the circumstances surrounding the interrogation, including 'the suspect's intelligence and education, age and familiarity with the criminal justice system, [and] the proximity of the waiver to the giving of the *Miranda* warnings.'" *Correll v. Thompson*, 63 F.3d 1279, 1288 (4th Cir. 1995) (holding that a waiver of *Miranda* rights was voluntary after the defendant had previously invoked his right to counsel, where the defendant had not been subjected to physical coercion or deprivation, defendant had "numerous experiences with law enforcement and *Miranda* warnings[,]" and "had been given *Miranda* warnings repeatedly since he was taken into custody . . . the most of recent of which was immediately preceding the waiver.") (quoting *Poyner v. Murray*, 964 F.2d 1404, 1413 (4th Cir. 1992) (internal citations omitted)); *see also Alvarez-Herrera*, 2013 WL 6531175, at *23 (holding the defendant's waiver of *Miranda* rights was knowing and voluntary where defendant had not been subject to physical coercion, had been read his rights in his native language, signed a waiver form, even though the form was in English, there was no evidence of defendant having "below-average intelligence" or "suffer[ing] from any mental disabilities[,]" and no evidence that defendant "failed to understand the rights as they were recited."). After a suspect has invoked his *Miranda* right to counsel and then decides to speak with law enforcement, "whether the suspect voluntarily, knowingly, and intelligently waived his right to counsel is a separate inquiry from the question of whether the suspect reinitiated interrogation." *Poyner*, 964 F.2d at 1412-14 (holding defendant knowingly and intelligently waived his right to counsel and spoke with police where he "possessed sufficient mental ability to waive his right to counsel[,]" "was no stranger to the criminal

31

justice system[,]" and had been "twice . . . advised of his right to counsel and . . . observ[ed] the detectives' willingness to cease the interrogation should he request counsel[.]").

The instant case presents two *Miranda* issues: (1) whether allowing Defendant Pineda access to Defendant Soto constituted the "functional equivalent" of interrogation in violation of *Edwards*, and (2) whether Defendant Soto's subsequent *Miranda* waiver was knowing and voluntary.[4] There is no dispute that Defendant Soto was in custody at the relevant time nor that Defendant Soto re-initiated contact with the police before giving a statement. On the day in question, at approximately 10:45 a.m., Sergeant Villagra read Defendant Soto his *Miranda* rights in Spanish before the search of the Harold Sutton Road residence began. Hr'g Tr. [DE-88] at 167-68. In response, Defendant Soto asserted his right to counsel.[5] *Id.* at 168 After Defendant Soto had invoked his right to counsel and during the search, officers asked Defendant Soto for consent to search the Altima parked at the Harold Sutton Road residence, which Defendant Soto granted. *Id.* at 169. After the search was completed, Defendant Soto was taken back to the La Grange substation. *Id.* at 173. While Detective

---

[4] Although Defendant Soto argues that suppression is required by the Sixth Amendment, [DE-66] at 1, he has not presented any argument in support of that position. Additionally, Defendant Soto's Sixth Amendment right to counsel is not implicated by the facts presented here, where judicial proceedings had not been initiated against Defendant Soto. *See United States v. Williamson*, 706 F.3d 405, 416 (4th Cir. 2013) ("A criminal defendant's Sixth Amendment right to counsel attaches after judicial proceedings have been initiated against him[.]") (citing *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991)); *see also United States v. Gouveia*, 467 U.S. 180, 189 (1984) (discussing same and noting that the Sixth Amendment right to counsel also extends to certain critical pretrial proceedings).

[5] At the hearing, some of the testimony suggested that Defendant Soto asserted both his right to counsel and right to remain silent after being read his *Miranda* rights. *See* Hr'g Tr. [DE-88] at 55 (Officer Howard: "Detective Villagra informed me that [Defendant Soto] had decided that he did not want to speak to law enforcement and adhere to his *Miranda* rights"); *id.* at 108 (on cross-examination, Officer Howard agrees that Defendant Soto had exercised his right to remain silent and confer with an attorney prior to questioning); *id.* at 168 (Sergeant Villagra stated that after he read Defendant Soto his *Miranda* rights, Defendant Soto stated that he wanted a lawyer); *id.* at 173 (Officer Corprew had been informed by Sergeant Villagra that Defendant Soto did not want to talk and wanted to speak to a lawyer); *id.* at 186 (on cross-examination, Officer Corprew agreed that Defendant Soto had invoked his right to counsel). However, Sergeant Villagra, who actually read Defendant Soto his *Miranda* rights and understood Defendant Soto's responses in Spanish, stated that Defendant Soto only invoked his right to counsel. "[I]t is the role of the district court to observe witnesses and weigh their credibility during a pre-trial motion to suppress." *Abu Ali*, 528 F.3d at 232. The undersigned determines, after hearing Sergeant Villagra's testimony and observing his demeanor on the stand, that Sergeant Villagra is credible in his recollection that Defendant Soto asserted only his right to counsel after receiving his *Miranda* rights prior to the search of the Harold Sutton Road residence.

Ochoa and Officer Corprew were interviewing Defendant Pineda in the interview room, Defendant Soto and Frederico were seated in the main conference room along with several other officers. *Id.* at 149, 181. After Defendant Pineda's interview was completed, he was escorted back to the conference room. *Id.* at 174. While walking to his seat and after he was seated, Defendant Pineda had a very brief conversation with Defendant Soto in Spanish, which no one overheard and understood. *Id.* at 162, 174-75, 183. Shortly thereafter (within ten seconds), Defendant Soto informed officers that he wished to speak and give a statement. *Id.* at 163. Officer Corprew testified that Defendant Soto did not seem upset or frightened after he spoke with Defendant Pineda. *Id.* at 179. Defendant Soto was then again advised of his *Miranda* rights in Spanish and signed a written waiver of those rights in Spanish at 3:30 p.m. before participating in an interview with Detective Ochoa and Officer Corprew. *Id.* at 175; Gov't Ex. 15.

Having asserted his *Miranda* right to counsel at 10:45 a.m., Defendant Soto could not be subject to further interrogation without counsel, unless Defendant Soto "initiate[d] further communication, exchanges, or conversations with the police." *Edwards*, 451 U.S. at 484-85. Officer Corprew testified that from the time Defendant Soto asserted his *Miranda* rights until he was actually interviewed at 3:30 p.m., there were no attempts made to interview him. Hr'g Tr. [DE-88] at 173. Similarly, Detective Ochoa testified that he did not see any officers talking to Defendant Soto, trying to get him to change his mind and give a statement. *Id.* at 150-51. While officers did ask Defendant Soto for consent to search the Altima after Defendant Soto had asserted his right to counsel, this request was not in violation of Defendant Soto's previously-invoked right to counsel as a request for consent to search does not constitute interrogation for *Miranda* purposes. *United States v. Gonzales*, 151 F.3d 1030, 1998 WL 377901, at *1 (4th Cir. July 1, 1998) (per curiam) (unpublished) (citing *United States v. Shlater*, 85 F.3d 1251, 1256 (7th Cir. 1996) (internal citation

33

omitted)); *see also United States v. Smith*, 3 F.3d 1088, 1098 (7th Cir. 1993) (collecting cases in agreement from the 5th, 8th, and 9th Circuits). *But see United States v. Hutchins*, 72 M.J. 294, 296-99 (C.A.A.F. 2013) (determining that a request for consent to search was impermissible re-initiation of communication in violation of *Edwards* where the accused had previously invoked his right to counsel, noting that *Edwards* prohibits further communication that may lead to further interrogation, and emphasizing that the investigator was clear that he reinitiated contact with the accused to further the investigation after the accused had been held for seven days of solitary confinement).

Defendant Soto's primary argument is that by allowing Defendants Pineda and Soto to talk after Defendant Pineda had given a statement to law enforcement, officers were engaging in conduct that they knew, or should have known, was reasonably likely to induce further responses from Defendant Soto. [DE-66]. The undersigned determines, however, that the officers were not engaging in the functional equivalent of interrogation which would violate *Edwards*. As an initial matter, Officer Corprew testified that due to the size of the La Grange substation, officers were unable to keep the defendants separate. Hr'g Tr. [DE-88] at 186. Additionally, both Detective Ochoa and Officer Corprew testified that they did not encourage Defendant Pineda to talk to Defendant Soto in order to encourage Defendant Soto to change his mind about giving a statement, although none of the officers told Defendant Pineda not to try and speak with Defendant Soto. *Id.* at 149-50, 162-63, 174. As Defendant Pineda was being escorted back to a seat in the main conference room, he had an extremely brief conversation with Defendant Soto. *Id.* at 162, 174-75. There is no evidence that the officers encouraged or instructed Defendant Pineda to try and get Defendant Soto to change his mind about wanting to speak with a lawyer prior to giving a statement to law enforcement.

The Supreme Court's decision in *Arizona v. Mauro*, 481 U.S. 520 (1987) is instructive to the

34

situation at hand. There, the court held that officers had not engaged in the functional equivalent of police interrogation when they allowed a wife to speak with her husband and an officer present in the same room recorded the conversation, knowing that there was a possibility the husband might incriminate himself during the conversation with his wife. *Id.* at 525-30. Here, officers cannot be said to have allowed Defendant Pineda to speak with Defendant Soto, as Defendant Pineda had an extremely brief conversation with Defendant Soto while he was being escorted back to his seat in the substation's conference room. This is distinguishable from *Mauro*, where the wife asked for and was granted permission to speak with her husband. *Id.* The conduct here falls far short of the officers' conduct in *Mauro*, which was held not to be in violation of the defendant's previously-invoked right to counsel. Additionally, the Fourth Circuit has emphasized that "the issue in *Miranda* and its descendants is whether particular actions *by the police* . . . constitute interrogation . . . . [as] the Fifth Amendment is not 'concerned with moral and psychological pressures to confess emanating from sources other than official coercion.'" *Kimbrough*, 477 F.3d at 150 (quoting *Elstad*, 470 U.S. at 304-05). Thus on the facts presented, the undersigned determines that Defendant Pineda's brief conversation with Defendant Soto was not the functional equivalent of interrogation, which would have violated Defendant Soto's previously-invoked right to counsel under *Edwards*. The undersigned must next determine whether Defendant Soto's subsequent waiver of his *Miranda* rights and statement to the officers was made knowingly and voluntarily.

Defendant Soto argues that his actions in re-initiating contact with the officers, waiving his *Miranda* rights, and giving a statement were not voluntary, but were instead the result of the officers' improper actions. [DE-66] at 3. However, considering the totality of the circumstances and the relevant factors, the undersigned determines that Defendant Soto voluntarily, knowingly, and intelligently waived his *Miranda* rights and gave a statement to police. *See Corell*, 63 F.3d at

35

1288 (listing the factors to be considered). The fact that Defendant Soto re-initiated contact with the officers within ten seconds of Defendant Pineda speaking to him could arguably weigh against finding a voluntary waiver. *But see Kimbrough*, 477 F.3d at 150 (discussing that the Fifth Amendment's concern is official coercion, not other moral or psychological pressures). Even so, the following factors all weigh in favor of a finding of a voluntary waiver of Defendant Soto's *Miranda* rights: (1) there is no evidence that Defendant Soto had experienced physical coercion or deprivation; (2) Defendant Soto had previous experiences with law enforcement and the criminal justice system; (3) Defendant Soto had been read his *Miranda* rights earlier that day and had actually asserted them, demonstrating that he understood his rights; (4) Defendant Soto was provided his *Miranda* rights again immediately prior to the waiver; (5) Defendant Soto received his *Miranda* rights in his native language; (6) Defendant Soto signed a written waiver of his *Miranda* rights in Spanish; (7) there was no evidence that Defendant Soto had below-average intelligence or any mental disabilities; and (8) Defendant Soto did not seem upset or frightened after speaking with Defendant Pineda. *See Correll*, 63 F.3d at 1288 (discussing the factors and finding a voluntary waiver); *Alvarez-Herrera*, 2013 WL 6531175, at *23 (same). Accordingly, having considered the totality of the circumstances and the relevant factors, the undersigned determines that Defendant Soto voluntarily, knowingly, and intelligently waived his *Miranda* rights and gave a statement to police. It is thus recommended that Defendant Soto's motions to suppress [DE-47, -66] be denied.

## IV. CONCLUSION

For the reasons set forth above, the undersigned RESERVES RULING on Defendant Pineda's motion in limine [DE-80], and it is RECOMMENDED that Defendant Pineda's motion to suppress [DE-79] be DENIED and Defendant Soto's motions to suppress [DE-47, -66] be DENIED.

IT IS DIRECTED that a copy of this Memorandum and Recommendation be served on each

36

of the parties or, if represented, their counsel. Each party shall have until **Wednesday, February 17, 2016** to file written objections to the Memorandum and Recommendation. The presiding district judge must conduct his or her own review (that is, make a de novo determination) of those portions of the Memorandum and Recommendation to which objection is properly made and may accept, reject, or modify the determinations in the Memorandum and Recommendation; receive further evidence; or return the matter to the magistrate judge with instructions. *See, e.g.*, 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3); Local Civ. R. 1.1 (permitting modification of deadlines specified in local rules), 72.4(b). Any response to objections shall be filed by within **14 days** of the filing of the objections.

**If a party does not file written objections to the Memorandum and Recommendation by the foregoing deadline, the party will be giving up the right to review of the Memorandum and Recommendation by the presiding district judge as described above, and the presiding district judge may enter an order or judgment based on the Memorandum and Recommendation without such review. In addition, the party's failure to file written objections by the foregoing deadline will bar the party from appealing to the Court of Appeals from an order or judgment of the presiding district judge based on the Memorandum and Recommendation.** *See Wright v. Collins***, 766 F.2d 841, 846-47 (4th Cir. 1985).**

SUBMITTED, the $\underline{3}$ day of February 2016.

Robert B. Jones, Jr.
United States Magistrate Judge

37